J-S05002-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: G.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.A.V. MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1214 WDA 2022 |

Appeal from the Order Entered September 19, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000024-2022

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McLAUGHLIN, J.

MEMORANDUM BY BENDER, P.J.E.:                     **FILED:  March 23, 2023**

B.A.V. (Mother) appeals from the order entered on September 19, 2022,

that granted the petition filed by the Allegheny County Office of Children,

Youth and Families (OCYF or CYF) to involuntarily terminate Mother's parental

rights to G.V. (Child), born in February of 2020, pursuant to sections

2511(a)(2), (5), (8) and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1]

After review, we affirm.

In her brief, Mother sets forth the following two issues for our review:

1.  Did the trial court abuse its discretion and/or err as a
    matter of law in granting the petition to involuntarily
    terminate Mother's parental rights pursuant to 23 Pa.C.S. §
    2511 (a)(2), (5), and (8)?

---

[1] J.T.B., Jr.'s (Father) parental rights to Child were also terminated at the
same time that Mother's rights were terminated.  However, Father did not
appeal from the trial court's order and is not a party to this appeal.

> 2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's brief at 6.

We have reviewed the certified record, the briefs of the parties, the applicable law, and the comprehensive opinion authored by the Honorable Paul E. Cozza of the Court of Common Pleas of Allegheny County, Orphans' Court Division, filed on November 14, 2022. Initially, we note that Judge Cozza provided an extensive recitation of the history of this case, the applicable standard of review and relevant caselaw, and an analysis of the issues raised by Mother, including the facts relied upon that support the factual basis for the decision. We conclude that Judge Cozza's well-reasoned opinion properly disposes of the two issues raised by Mother. Of particular note, the trial court's opinion discusses the testimony provided at the various hearings held during the two-year pendency of this matter that was supplied by a number of caseworkers and Dr. Terry O'Hara, the court appointed psychologist, who completed evaluations of Mother, Child and the foster parents. Moreover, the trial court indicated that Mother's mental health problems were relatively stable when she is in a highly structured program, but that at other times she overlooked her problems and was inactive in seeking help when not in such a program. Essentially, Mother's arguments appear to center on the court's credibility determinations, in that her discussion of the facts is contrary to that set forth by the trial court. Our

standard of review prohibits this Court from overturning the trial court's credibility determinations so long as its findings are supported by the evidence of record. *See In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (stating that the trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence). In this case, the court's credibility determinations are supported by an overwhelming majority of the evidence. Accordingly, we adopt Judge Cozza's opinion as our own and affirm the order appealed from on that basis.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  3/23/2023

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN THE INTEREST OF: G.V., a minor child

APPEAL OF: B.V., natural mother

**CHILDREN'S FAST TRACK APPEAL**

OPINION

Docket No.:   AP-24-2022
1214 WDA 2022

BY:

Honorable Paul E. Cozza
440.Ross Street
Suite 524
Pittsburgh, PA 15219

**EMAIL COPIES TO:**

Brianna Herzing, Esquire
Kristen Hunsicker, Esquire
Courtney Potter, Esquire
Jean Lupariello, Esquire

1

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN THE INTEREST OF: G.V., a minor child

APPEAL OF: B.V., natural mother

**CHILDREN'S FAST TRACK APPEAL**

Docket No.: AP-24-2022
1214 WDA 2022

OPINION

COZZA, J.                                                    November 14th, 2022

**Procedural History:**

On August 26th, 2022, this Court granted Allegheny County Office of Children Youth

and Families' (hereinafter OCYF) Petition to Terminate the Parental Rights of B.V.. (hereinafter

Mother) pursuant to 23 Pa. C.S.A. § 2511(a)(2), (5), (8) and (b)[1]. Mother alleges that this

court abused its discretion and/or erred as matter of law in concluding that OCYF proved by

clear and convincing evidence that grounds for termination existed pursuant to 23 Pa.C.S.A.

2511§(a)(2)(5)(8) and that termination would best serve the needs and welfare of the child

pursuant to 23 Pa.C.S.A. §2511 (b). For the reasons set forth below, the order of this court

should be affirmed.

**History:**

G.V. was born in February ⬤ 2020. She was born two months premature and placed

in the Neonatal Intensive Care Unit for several weeks after her birth. Tr. at 148. G.V. tested

positive for THC at birth and a referral was made to OCYF. OCYF attempted to make

contact with the parents at the hospital but could not because they were not visiting the

hospital frequently. Tr. at 77. OCYF ultimately had to hire a private investigator to locate the

---

[1] The order was docketed on September 19th, 2022.

2

parents. Tr. at 75. The caseworker, Christina Moran, was able finally to speak to the parents on March 5th, 2020. Tr. at 76. Mother reported that she was having trouble getting transportation to the hospital and admitted to using marijuana during her pregnancy. Tr. at 77. OCYF made a referral to the drug and alcohol program, POWER, for Mother. Mother did attend an evaluation at POWER but did not follow through with the recommendations. Tr at 78. OCYF implemented in-home services through Life Work of Western Pennsylvania at a crisis level to assist the family. Tr.at 6, 78. The family agreed to work with OCYF and in-home services and G.V. was permitted to return to the care of her parents upon her release from the hospital. Tr. at 80.

OCYF attempted to work with the family in the spring and early summer of 2020. The in-home service worker began working with the family in June of 2020. The family was largely uncooperative during that time, so OCYF filed a Petition alleging Dependency on July 31st, 2020. Tr. at 79. The adjudicatory hearing was deferred until December 1st, 2020 to allow the family to work with services. Tr. at 80. Mother was ordered to participate in parenting classes, ensure the child's medical needs were being met, and continue mental health treatment. Tr. at 81.

During the three-month deferral of the Adjudication Hearing, the family's compliance remained minimal. As such, OCYF went forward with the Dependency Petition on December 1st, 2020. The court adjudicated G.V. dependent but allowed the child to remain in the physical custody of the parents. Mother was ordered to participate in parenting classes, to continue mental health treatment, to consistently meet with in-home services and OCYF, and to obtain or maintain stable housing. Mother was also ordered to ensure that the child's occupational, physical and developmental therapy appointments were kept along with an appointment for a helmet fitting. OCYF Exhibit 5- December 1st, 2020 Court Order.

3

From December 1st, 2020 to December 18th, 2020, OCYF had limited contact with the parents. Tr. at 83. During this brief period, OCYF also learned that G.V. was not receiving her therapeutic services and had not attended an appointment for a helmet fitting. Tr. at 82. As a result, OCYF sought and obtained an Emergency Custody Authorization on December 18th, 2020 to remove the child from the care of her parents. Tr at 82. The child was placed in the foster home of Amy and Paul Piccolino. Tr. at 84.

A Shelter Care Hearing was held on December 23rd, 2020 and the court ordered G.V. to remain in her foster care placement. OCYF reported that the parents had not followed through with the child's medical appointments. Mother was not involved in mental health treatment and OCYF reported concerns about increasing incidents of domestic violence between the parents. The court ordered Mother to attend mental health treatment, to sign releases for OCYF, to work with in-home services, to maintain stable housing and to address the child's medical needs. OCYF Exhibit 5- December 23rd, Court order.

A Shelter Care Hearing was held on January 8th, 2021. The court ordered that G.V. remain in her foster care placement. The foster parents were appointed secondary medical and educational decision-makers. The court ordered Mother to participate in mental health services and to work with in-home services. The court ordered the visits to remain supervised with permission to move to unsupervised when OCYF was able to confirm that the parents were fully engaged with services. OCYF Exhibit 5- January 8th, 2021 Court Order.

A Permanency Hearing was held on March 18th, 2021 and the court ordered the child to remain in her foster care placement. Mother was found to be in minimal compliance and to have made minimal progress. Mother had not maintained regular contact with OCYF during this reporting period but had re-engaged with her mobile therapist. She had begun parenting classes but had not been consistently attending visitation. The court ordered

4

Mother's visits to be supervised and to occur twice a week. The court ordered Mother to attend mental health treatment and cooperate with services. At the time of the hearing, G.V. began wearing her helmet and had been doing well in her occupational and physical therapies. Mother was not engaged with any of these services and reported being unaware why the child needed a helmet. The court ordered Mother to attend mental health treatment, sign releases for OCYF, attend her parenting classes, and participate with in-home services. OCYF Exhibit 5- March 18th, 2021 Court Order. In April of 2021, police were called to the family home for a domestic violence incident. Mother reported that Father became so enraged that he threw an iPad at her face which caused visible injuries. Father was involuntarily committed to Western Psychiatric Institute and Clinic. Tr. at 168. Mother did not seek a Protection from Abuse Order. Tr. at 28.

A Permanency Hearing was held on June 10th, 2021 and the court ordered that G.V. remain in her foster care placement. Mother was found to be in minimal compliance with the permanency plan and to have made minimal progress. During this reporting period, Mother had been visiting consistently but had not been in regular contact with the in-home worker or OCYF. Mother reported to being in mental health treatment. The court ordered Mother to attend mental health treatment, to sign releases for OCYF, to attend parenting classes and to undergo an assessment for domestic violence therapy. The court ordered Mother's visits to be supervised and to occur twice a week. OCYF Exhibit 5- June 10th, 2021 Court Order.

A Permanency Hearing was held on September 2nd, 2021 and the court ordered the child to remain in placement. Mother was found to be in moderate compliance and to have made moderate progress. Mother was visiting regularly and reported to being separated from Father since April of 2021. Mother was in in-patient treatment at Mercy

5

Behavioral Health to address her mental health. Mother did report to being homeless. The court ordered Mother's visits to be supervised and to occur twice a week. OCYF Exhibit 5- September 2nd, 2021 Court Order.

In-home services were closed out in November 2021 for non-compliance. Tr. at 6. A Permanency Hearing was held on December 16th, 2021 and the court ordered that G.V. remain in her placement. Mother was found to be in moderate compliance and to have made moderate progress. Mother was visiting regularly during this period but was not in mental health treatment, and in-home services had closed out. The court ordered that Mother's visits occur twice a week be supervised by OCYF. OCYF Exhibit 5- December 16th, 2021 Court Order.

OCYF filed the Petition to Involuntarily Terminate Mother's Rights on March 7th, 2022. Tr. at 85. In March of 2022, Mother appeared for a visit with physical injuries to her face and body. She later admitted that Father had punched her in the face because he was under "a lot of stress". Tr. at 96, 176. A Permanency Hearing was held on March 30th, 2022 and G.V. was ordered to remain in her foster care placement. Mother was found to have made no compliance with her permanency plan and to have made no progress. The court found that Mother had not provided OCYF with documentation of compliance with mental health services, was not maintaining contact with OCYF and had only recently begun IPV services. The Court ordered Mother to continue IPV counseling, to engage in mental health treatment, to obtain stable housing and to sign releases for OCYF. OCYF Exhibit 5- March 30th, 2022 Court Order.

Dr. Terry O'Hara, the court appointed psychologist assigned to the family, completed a series of evaluations in August of 2022. As a part of those evaluations, he completed an

6

interactional evaluation with the child and foster parents, an interactional evaluation between Mother and the child and an individual evaluation of Mother.

**STANDARD OF REVIEW AND RELEVANT CASELAW:**

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." **In re Adoption of S.P.** 47 A.3d 817, 826 (Pa. 2012)."[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re Q.R.D.,** 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

In termination proceedings, the trial court must conduct a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. **In re L.M.,** 923 A.2d 505, 511 (Pa. Super. 2007)(citations omitted).

## § 2511. Grounds for involuntary termination

> (a) General Rule. —The rights of a parent in regard to a child may be terminated after a petition is filed on any of the following grounds:
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent that has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

7

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) Other considerations-The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely based on environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated after the giving of notice of the filing of the petition.

## 2511(a)(2)(5)(8) and (b)

With respect to subsection 2511(a)(2), the following three elements must be met: (1) repeated and continuing incapacity, abuse, neglect, or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of that incapacity, abuse or neglect or refusal cannot or will not be remedied. "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as an incapacity to perform parental duties." **In re A.L.D.**, 797 A.2d 326, 337 (Pa.Super. 2002) (citations omitted). Subsection 2511(a)(5) requires OCYF to prove that (1) the child has been removed from the parent's care for a period of at least six months; (2) the conditions which led to removal continue to exist, (3) the parent cannot or will not remedy those conditions which led to removal within a reasonable period of time, (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal within a reasonable period of time and (5) that termination of parental rights would best suit the needs and welfare of the child. **In re Adoption of M.E.P.**, 825 A.2d 1266, 1273(Pa.Super.2003).

Subsection (a)(8) requires that OCYF prove (1) the child has been removed from the care of the parents for twelve months, (2) that the conditions that led to the removal of the child continue to exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. Subsection (a)(8) does not require an evaluation of [the parents] willingness or ability to remedy the conditions that led to placement of the children. **In re Adoption of R.J.S.**, 901 A.2d 502, 511 (Pa.Super. 2006)(internal citations omitted). Subsection(a)(8) requires only that the conditions continue to exist, not an evaluation of

8

parental willingness or ability to remedy them. **In re C.L.G.**, 956 A.2d 999,1007 (Pa. Super 2008)(Internal citations omitted). By allowing termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a "child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future". **C.L.G.**, 956 A.2d 999, 1005.; **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa.Super. 2006).

The best interest analysis focuses on whether termination would best suit the developmental, physical and emotional needs and welfare of the child. The Pennsylvania Superior Court has explained,

> Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interests of the child... In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security and stability the child might have with the foster parent. Additionally, this court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

**In re Adoption of C.D.R.**, 111 A.3d 1212, 1219 (Pa.Super.2015) (quoting **In re N.A.M.**, 33 A.3d 95, 103 (Pa.Super. 2011)(quotation marks and citations omitted)).

The party petitioning for termination "must prove the statutory criteria for that termination by at least clear and convincing evidence." **In re T.R.** , 465 A.2d 642, 644 (1983). Clear and convincing evidence is defined as "testimony so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." **Matter of Sylvester**, 555 A.2d, 1202, 1203-04 (1989).

9

**ANALYSIS:**

Mother alleges that this court abused its discretion and/or erred as matter of law in concluding that OCYF proved by clear and convincing evidence that grounds for termination existed pursuant to 23 Pa.C.S.A. 2511§(a)(2)(5)(8) and (b). As a part of the bifurcated analysis as required in section 2511 of the Adoption Act, the court considers the conduct of the parent to determine whether grounds for termination exist pursuant to 2511(a). As a part of it's 2511(a) analysis, this court always considers the goals set for the parent and whether the parent was able to successfully complete those goals. In the instant case, Mother's goals included making and keeping medical appointments for the child, maintaining appropriate housing, attending mental health treatment, working with in-home services, working with Alliance for Infants to ensure the child's needs were met, attending a parenting program and Intimate Partner Violence (IPV) counseling. Tr. at 86-87, Joint Exhibit A- Mother's stipulations.

One of Mother's long-standing goals was to schedule and attend G.V.'s medical appointments. G.V. had several health concerns due to her premature birth and was recommended to engage with physical, occupational and developmental therapy. Tr. 87-88. Mother was not consistent in scheduling these appointments which was one of the factors that led to G.V. being removed from her care. After G.V.'s removal, the therapy appointments were scheduled during Mother's visits so that she could participate. However, this arrangement was short lived as Mother was not consistent with visitation. These services ultimately had to be moved into the foster home. Tr. at 30. The Foster Mother and the foster care caseworker, Mina Needham, advised Mother about the dates and times of medical appointments. Tr. at 29. Mother has never consistently attended these therapies and has not regularly attended the child's medical appointments. Tr. at 29, 88. Mother reported

10

several barriers to her attending and participating in G.V.'s services. OCYF provided Mother with resources to assist including giving her an iPad to attend doctor's visits or therapies virtually and providing bus tickets to address transportation issues. Tr. at 89. Despite Mother's more recent period of stability, she still has not attended and participated in G.V.'s medical appointments. In the approximately two years that the case has been open, Mother has never been able to satisfactorily complete this goal.

Housing has also been a long-standing goal for Mother. Despite being offered assistance and referrals from her in-home service worker, Mother has been unable to maintain stable housing. She lived in an apartment briefly but was evicted. For much of the case, Mother has been homeless. Since May 31st, 2022, Mother has been residing in a structured residential program called City Mission. Tr at 92. City Mission provides Mother with a place to live, along with food and basic necessities. This program is not a long-term living arrangement. Mother would need to obtain employment and locate affordable housing. Mother has not identified a time frame in which she believes that she could obtain independent housing. She has heavily relied on her various service providers to assist in this regard. Mother would still need significant assistance in obtaining housing and as such, the court finds that Mother has not satisfied this goal.

Working with in-home services was also a goal for Mother. This service was vital for Mother because it connected her with referrals and services that would have assisted her in meeting her court-ordered goals. These referrals could have helped Mother with housing, parenting classes, IPV counseling and mental health treatment. Mother's compliance and cooperation has never been consistent, even when G.V. was in her care. Tr. at 7. In the fourteen months that the service remained open, Mother did not follow through with any of these referrals except for a referral to Mercy Behavioral Health in August of 2021. Tr. at 14.

11

Mother stopped communicating with her in-home worker, Ms. Pfaff, entirely after the referral to Mercy was made. Tr at 13. In-home services closed unsuccessfully in November of 2021. Tr. at 9. For these reasons, the court found that Mother did not complete this goal.

Parenting was also an important goal for Mother. She did not complete any parenting programs referred by her in-home worker and prior to the filing of the termination petition. Tr. at 93. Mother reported to receiving several parenting "certifications" while residing at the City Mission program. Tr. at 135, 164. Mother was fairly consistent with visitation but did miss one to two visits a month and did appear late for visits. Tr. at 24. Mother's visitation became much more consistent when she became involved in the DAS Program and then moved to City Mission. It should be noted that Mother is also in a structured facility and OCYF provides transportation for the child. Tr. at 98. Mother can provide for G.V.'s basic needs during her brief periods of visitation. All reports are that her visits and interactions go well with G.V.. Dr. O'Hara reported that Mother displayed several positive parenting skills during his interactional evaluation with her. Tr. at 47. However, Mother has never been able to obtain unsupervised visitation. She has never engaged in a parenting program to determine what, if any, parent deficits she may have. The Court commends Mother for locating online parenting courses but these are not interactive programs and as such, the court has no baseline for what her parenting looks like. The court has no evidence that Mother is able to parent G.V. without the assistance of her current service providers. For these reasons, the court finds that Mother did not satisfy this goal.

Mental health treatment was another important goal for Mother for several reasons. Mother has several mental health issues including Bipolar Disorder and Generalized Anxiety Disorder. Tr. at 54. She also reported to experiencing extreme depression. Tr. at 156. Appropriate mental health treatment was a critical component to Mother obtaining the

12

stability needed to reunify with her daughter. Mother's mental health diagnoses were such that long-term, consistent treatment was recommended. Tr. at 55.

After nearly two years of involvement with the courts and OCYF, Mother finally sought out an appropriate level of treatment through the Diversion and Acute Stabilization (DAS) Program at Mercy Behavioral Health. Tr. at 116. She was engaged with the program from March 29th, 2022 to May 31st, 2022. Id. Upon her discharge, Mother was able to connect with a primary care physician who could provide her with medication management. Tr. at 183. However, Mother did not continue mental health treatment and reported that she had issues with her insurance as well as long wait times for therapy. Tr. at 184. Mother has not adequately addressed her mental health for the majority of the case. While the court commends Mother for finally seeking out treatment through the DAS Program, it does not excuse the vast amount of time that she did not. Mother is currently not in mental health treatment. Although Mother's mental health appears to be relatively stable at the moment, it should be noted that she is in a highly structured program. The court does not believe that Mother would be able to function independently in the community without engaging in intensive mental health services. The court simply cannot overlook Mother's inaction in this regard. For these reasons, the court finds that Mother did not complete this goal.

Intimate partner violence has been a long-standing concern in this case and the reason why counseling was so important for Mother. Domestic violence is a complex issue and one that is not easily resolved. These cases, the instant one included, involve years of mental abuse and manipulation. Unfortunately, it appears that Mother has been victimized for most of her life and has admitted to being involved in several relationships where domestic violence was an issue. Tr. at 56. The relationship between Mother and G.V.'s Father has been marred by physical abuse and emotional abuse caused by Father's

13

manipulative and controlling nature. Tr. at 171. As early as December of 2020, OCYF reported concerns about the unhealthy dynamic between Mother and Father and made a referral for Mother to attend IPV treatment. Mother was court-ordered to attend IPV counseling at every single court hearing. She had a caseworker and an in-home services worker who could have assisted with transportation or facilitating the intake. Mother took no action until after the Termination Petition was filed. Tr. at 95. The court commends Mother for completing twelve sessions through the Women's Center and Shelter. Mother Exhibit 3. However, these sessions are merely the beginning of the process that she must undertake to truly understand the dynamics of intimate partner violence and its effects. Ultimately, the court would like Mother to exhibit some level of understanding about the factors that contributed to her remaining in a relationship with Father. Additionally, the court would expect Mother to have experienced a significant period of separation from Father to process this information. Mother has only been separated from Father for a few months and reports to still having some communication with him. The court believes that Mother will need to engage in a continued course of IPV counseling to make meaningful changes in her life. For this reason, the court found that Mother did not satisfactorily complete this goal.

Mother's repeated and continued incapacity has caused G.V. to be without essential parental care. The conditions which led to her removal continue to exist and Mother has been unable to remedy these conditions. The court finds that Mother is not likely to remedy these conditions within a reasonable period of time as she has been unsuccessful for the past two years.

Moving to the best interest analysis, the court considered several factors including the safety needs of G.V., the nature of bond between her and Mother, and the relationship between her and the foster parents. The safety of the child is always an important

14

consideration. In the instant case, there are several factors which give the court pause as it relates to Mother's ability to keep the child safe. First, Mother's mental health issues are significant and pervasive. She has reported to being unable to care for her own needs when experiencing symptoms of her mental health conditions. This is particularly concerning based on G.V.'s young age. This raises concerns for not only G.V's physical safety but her overall well-being as well.

If G.V. were returned to Mother, the court would have significant concerns about her exposure to domestic violence. As reported by Dr. O'Hara, exposure to domestic violence can have significant impacts on young children. Dr. O'Hara briefly addressed the subject in his testimony but certainly expressed a concern about it in this particular case. Tr. at 57. As mentioned previously, Mother has been victimized throughout her life. Completion of twelve virtual classes is simply not enough to undo years of learned behavior which has caused her to engage in unhealthy and unsafe relationships. Much like untreated mental health issues, exposure to domestic violence could not only affect G.V.'s physical safety but her overall well-being as well.

Mother's stability is also a factor that the court considered when examining the safety needs of the child. While Mother has experienced stability more recently, the court is not confident that she will be able to function independently in the community. The court has concerns about Mother's ability to abstain from unhealthy relationships, attend mental health treatment, and maintain stable housing once released from City Mission. Mother has been unable to do these things while in the community and essentially waited until the eleventh hour before she took any action to address her goals. The court does not believe that Mother is capable now or in the foreseeable future of providing for the safety and stability of G.V..

15

The bond analysis is a major aspect of the court's best interest analysis. When a bond exists, as in this case, the court must decide whether it can be severed without detrimental effects to the child. G.V. sees Mother once a week for four hours. G.V. is comfortable in Mother's care and shares a good relationship with her. Dr. O'Hara reported that the child does have a bond with Mother and did exhibit characteristics of security in her relationship with Mother. Tr.at 63. Throughout the case, Mother has made visiting a priority over all of her other court ordered goals and that is evidenced by her relationship with her daughter. There is no doubt that the child would suffer some detriment if the relationship with Mother ceased. However, the court does not believe that G.V. would suffer irreparable harm. G.V. has remained in the same foster home since December of 2020 and enjoys a stable, loving relationship with her foster family. Dr. O'Hara opined G.V. has a meaningful and nurturing relationship with the foster parents and that the foster parents are providing safety, stability and security for her. Tr at 52. He also observed several indicators of security in the child's attachment to the foster parents. Tr.at 68. The foster care caseworker, Ms. Needham, has observed the child in her foster home and reported that the child is very affectionate with her foster family and always happy. Tr at 31. She further reports that the foster parents have been meeting the child's medical and emotional needs. Tr. at 32. Cassie McIlwain, the permanency caseworker, reported that the child appears happy and healthy in the foster home. Id. She further reported that the child is affectionate with her foster parents. Tr. at. 41. OCYF caseworker, Christina Moran, reported that the child is doing great in her foster home. Tr. at 106. She further opined that G.V. has made substantial progress in her foster home. Tr. at 107. For these reasons, the court finds that the foster parents could address any possible repercussions of the cessation of the relationship between G.V. and Mother.

16

G.V. has been in foster care for nearly two years and deserves permanency. Reunification with Mother is not realistic and further delaying permanency for G.V. is not in her best interests. For these reasons, the order of the should be affirmed.

BY THE COURT:

_____, J.